IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH THE
DOMAIN ███████████████
WHICH IS STORED AT PREMISES
CONTROLLED BY GOOGLE, INC.

Case: 1:15-mj-0021
Assigned To : Magistrate Judge Deborah A. Robinson
Assign. Date : 01/23/2015
Description: Search and Seizure Warrant

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, ███████████ a Special Agent with the Federal Bureau of Investigation ("FBI"),

Washington, D.C. Field Office, being duly sworn, hereby state as follows:

### INTRODUCTION

1.     This affidavit is submitted in support of a search and seizure warrant authorizing a

search of the location and things described in Attachment A for evidence, instrumentalities, and

contraband as described in Attachment B.

2.     I am a Special Agent of the Federal Bureau of Investigation (FBI), and have been

███████████████     Prior to becoming a Special Agent, I was an █████████████

████████████████████████████████████████████████████████

███████████████████     During my employment with the FBI, I have conducted and/or

assisted in many criminal investigations involving public corruption, fraud, false statements, and

other related federal violations. I have training and experience in the enforcement of the laws of the

United States, including the preparation and presentation of affidavits in support of warrants.

Among other things, I have had both training and experience in the investigation of computer-related

crimes and have worked with other FBI agents who have such experience, and who have provided

1

me with additional information about such crimes.  My formal education includes a

3.     The facts set forth in this affidavit are based upon my personal knowledge, knowledge obtained during my participation in this investigation, knowledge obtained from other law enforcement personnel, review of documents related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through training and experience.  The information presented in this affidavit is provided to show that there is sufficient probable cause for the requested warrant.  This affidavit does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of the following statutes, among others, have been committed: 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 600 (promise of employment or other benefit for political activity); D.C. Code § 1-1107.01(b), amended and recodified in D.C. Code § 1-1163.35(c) (making a false statement or report); and D.C. Code § 22-1805a (conspiracy to commit crime or defraud the District of Columbia of lawful government functions).  There is also probable cause to search the information described in Attachment A for evidence of these crimes as described in Attachment B.

## JURISDICTION

5.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711(3).  *See* 18 U.S.C. § 2703(a), (b)(1)(A) &

(c)(1)(A).  Specifically, the Court is "a district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).

6.      Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

### Relevant Persons and Entities

7.      Beginning in the spring of 2010, and ███████████████████████████████

████████████████  was a candidate for Mayor of the District of Columbia.  ████  principal campaign committee was called  ████  for Mayor (hereinafter, the  ████  Campaign").  ████████

████████████████████████████████████████████████████████████████████████████████

8.      Beginning in the spring of 2010, and continuing through the 2010 general election, Vernon Hawkins ("Hawkins") was a Special Advisor for the ████ Campaign.  Hawkins provided advice to ████ and others in the campaign on such matters as staffing, communications, and field operations, including Get Out The Vote ("GOTV") efforts.  Hawkins previously had served as a paid consultant and community outreach worker for ████ 2004 campaign for D.C. Council Member and as a volunteer advisor for ████ 2006 campaign for the Chair of the D.C. Council.  On August 13, 2013, Hawkins pled guilty to making a false statement to the FBI regarding efforts to obstruct the federal investigation into the ████ Campaign.

9.      Jeffrey E. Thompson ("Thompson") was the CEO, Chairman, and majority owner of the public accounting and management consulting firm, Thompson, Cobb, Bazilio & Associates

("TCBA"), which maintains its principal office in the District of Columbia. In or about March 2012, Thompson resigned from TCBA. In or about July 2012, Thompson sold his share of TCBA to a partner. TCBA did business with the federal government, the D.C. government, and other state and local governments. According to the D.C. Office of Contracting and Procurement website, the D.C. government issued and paid more than $22 million to TCBA between in or about 2004 and in or about 2011.

10.     Thompson was the sole owner of a holding company known as D.C. Healthcare Systems, Inc. ("DCHSI"), a healthcare investment company. On or about May 17, 2000, DCHSI purchased D.C. Chartered Health Plan, Inc. ("Chartered Health"). DCHSI wholly owned Chartered Health, and Thompson was Chairman of the Board of Directors of Chartered Health. Chartered Health provided managed healthcare services to approximately 100,000 D.C. Medicaid recipients pursuant to a contract with the D.C. government.

11.     Thompson pleaded guilty to a two-count Information on March 10, 2014 charging (a) conspiracy to make a contribution in the name of another and to destroy, alter, or falsify records in federal investigations, in violation of 18 U.S.C. § 371, 2 U.S.C. §§ 441a, 441b, 441f, and 437g(d)(1)(A)(i), and 26 U.S.C. § 7206(2), and (b) conspiracy under the laws of the District of Columbia, in violation of D.C. Code §§ 22-1805a(a)(1). The D.C. Code conspiracy charge related, in part, to unreported funds contributed by Thompson during the 2010 primary election to pay for, among other things, services and materials to assist in GOTV activities in support of and in coordination with the ███ Campaign (hereinafter, the "Thompson-funded GOTV activities").

12.     Eugenia Clarke Harris ("Harris") owned and controlled two for-profit corporations registered in the District of Columbia: Belle International, Inc. ("Belle"); and Details International,

4

Inc. ("Details"). Belle and Details had offices in Washington, D.C. Records for bank accounts held in the name of both Belle and Details reflect that between in or about April 2010, and in or about September 2011, most of the incoming funds into the Belle and Details bank accounts were from DCHSI and TCBA. Harris was also a longtime friend of ███████. On July 10, 2012, Harris pled guilty to, among other things, conspiring with Thompson and others to make campaign contributions in the names of others in federal and local District of Columbia elections.

## STATEMENT OF PROBABLE CAUSE:
### Facts Relevant to Specific Categories of Evidence

**Paragraphs (a) – (f): Evidence related to the contributions, expenses, finances, operations, and personnel, whether official or unofficial, of the ███ Campaign and efforts in support thereof, including GOTV activities.**

13.     As stated above, the investigation relates in part to the Thompson-funded GOTV activities, *i.e.*, unreported funds contributed by Thompson during the 2010 primary election to pay for, among other things, services and materials to assist in GOTV activities in support of the ███ Campaign. Those Thompson-funded GOTV activities worked closely with members of the ███ Campaign, including, among other things, working out of the same campaign headquarters as the ███ Campaign, sharing canvassing information, and coordinating the allocation of canvasser resources.

14.     Harris arranged for and paid expenses associated with the Thompson-funded GOTV activities through Harris's company, Belle. Harris received a check from TCBA on or about July 28, 2010, in the amount of $87,800, which she used to pay for materials and services in support of the ███ Campaign. Such contributions were not reported to the OCF.

15.    Harris, Hawkins, and Thompson described that they discussed the need for hundreds

of thousands of dollars to pay for GOTV activities in support of the ███Campaign.  Hawkins

described that he drew up a GOTV plan and budget.  Hawkins described that he (Hawkins) met with

Thompson and discussed, among other topics, the need for an effective GOTV effort in support of

the ███Campaign.  Hawkins described a three-way telephone call in which Thompson, Harris, and

Hawkins discussed aspects of the budget for Thompson-funded GOTV activities.  The budget

included money to hire coordinators, canvassers, drivers, and rental vans, among other things.

Thereafter, ████████████████████personally asked Thompson for the money.[1]

16.    Harris and Thompson described a dinner at Harris's apartment in the District of

Columbia between ███ Harris, and Thompson.[2]  At the dinner, ███ and Thompson discussed

funds needed to pay for GOTV activities in support of the ███Campaign.  Thompson, by his own

account, agreed to pay for the GOTV activities through Harris.  Harris, by her account, understood

that Thompson agreed to provide funds to pay for the GOTV activities as a "loan."

17.    Thereafter, between the date of the dinner meeting and the mayoral primary election

on September 14, 2010, Harris received the following payments to support the ███Campaign

through the Thompson-funded GOTV activities:

---

[1] Prior to the elections in 2010, Harris served as a pass-through by which Thompson had
made conduit contributions and/or unreported contributions to various federal and District of
Columbia political campaigns.  Harris also served as a pass-through by which Thompson made
unreported contributions to two candidates for D.C. Council during the 2010 election, Jeffrey Smith
and Kelvin Robinson.  Both Smith and Robinson have pleaded guilty to receiving unreported
campaign donations from Thompson and Harris.

[2] Harris initially described the dinner meeting taking place in July 2010.  Based on other
witness statements and documents, it appears that the dinner meeting took place on Friday,
September 3, 2010.

| Deposit Date | Transaction Type | Payor | Payee | Amount |
|---|---|---|---|---|
| September 7, 2010 | Check | TCBA | BELLE | $180,000 |
| September 10, 2010 | Wire | TCBA | BELLE | $76,000 |
| September 10, 2010 | Check | TCBA | BELLE | $185,000 |
| September 14, 2010 | Wire | TCBA | BELLE | $125,000 |

The entire reported budget of the ███ Campaign for the primary election was approximately $2.89 million.

18.   Harris further described that ███ played a direct role in supporting Hawkins's implementation of the Thompson-funded GOTV activities.[3] Specifically, Harris described that when Hawkins started implementing the Thompson-funded GOTV activities in support of the ███ Campaign, ████████████ asked Hawkins how such an expanded GOTV effort would be funded; Hawkins said he could not tell her. According to Harris, ████████ told Hawkins that if he (Hawkins) did not tell her, then he would be "out." Subsequently, according to Harris, the ███ Campaign's ████████████, who also served as ███ to the ███ Campaign, told staff on the ███ Campaign not to interact with Hawkins. Thereafter, however, Hawkins told Harris that the GOTV could not function under such conditions, a concern which Harris said that she passed on to ███. ████████ then told ████████ and ████████ that the GOTV activities were funded, causing ████████ to rescind his previous instruction regarding working with Hawkins.[4]

---

[3] Hawkins initially denied playing any significant role in implementing the Thompson-funded GOTV activities and any first-hand knowledge of Thompson's funding efforts to assist the ███ Campaign.

[4] ████████ stated that she did not discuss any such GOTV activities with Hawkins. ████████ recalled a meeting with ███ and Hawkins in which ███ told ███ that Hawkins was doing an "independent thing" and directed ███ to be "good" or "kind" to Hawkins.

19.     Using funds received from Thompson, Harris hired various consultants who operated out of the same floor of the same building on Sixth Street N.W., Washington, D.C., used for the GOTV operation by the ███ Campaign; the official headquarters for the ███ Campaign was located next door to both GOTV operations. Ultimately, the Thompson-funded GOTV operations relocated to the first floor, below the GOTV operation run by the ███ Campaign.

20.     The Thompson-funded GOTV activities included various consultants who managed and transported dozens of paid canvassers.

21.     The Thompson-funded GOTV activities worked closely with the GOTV operation run by the ███ Campaign, using the same or similar campaign materials ordered from the same vendors, sharing canvassing information, and allocating canvasser resources to avoid overlap. Hawkins described personally observing conversations between the consultant running the Thompson-funded GOTV activities, ███ and officials working for the ███ Campaign.

22.     In addition to Hawkins, various other officials and workers for the ███ Campaign admitted knowing about the Thompson-funded GOTV activities, although some described the Thompson-funded GOTV activities as purportedly independent of the ███ Campaign and most were not certain who was funding the other effort.

23.     On or about September 14, 2010, ████████████████████████ ███ in the District of Columbia mayoral primary.

24.     ████████████████████████
████████████████

8

**Paragraph (g): Evidence of any motive to commit campaign finance offenses, to engage in unreported campaign activity, or to commit other offenses, including but not limited to concerns about the performance and polling results related to** ▆▆▆▆ **campaign for Mayor in 2010.**

25.     The investigation has found evidence of motives to commit various campaign finance offenses and engage in other offenses.  For example, the investigation has obtained statements from witnesses and documents that evidence the importance of the GOTV activities to the ▆▆▆▆ Campaign, actual and perceived dysfunction related to certain personnel responsible for managing the GOTV activities for the ▆▆▆ Campaign, and beliefs by certain ▆▆▆ Campaign members, particularly Hawkins, that the amount of funds made available for the GOTV activities by the ▆▆▆ Campaign were insufficient.  The importance of the GOTV activities, combined with the perceived lack of effective GOTV efforts by the ▆▆▆ Campaign, provided strong incentives for ▆▆▆ and others to seek and obtain the Thompson-funded GOTV efforts.

26.     The investigation has also obtained evidence of motive by the ▆▆▆ Campaign to limit the number of political opponents ▆▆▆ had to face in the primary election.  For example, an email dated August 18, 2010 from ▆▆▆▆▆▆▆▆▆▆▆▆▆▆ for the ▆▆▆ Campaign, forwarding to ▆▆▆▆▆▆▆▆ a copy of a news article (dated the same day titled "D.C. poll finds ▆▆▆ holds slim lead over Fenty"), which discussed a poll showing that ▆▆▆ polling results (and, impliedly, electoral results) would improve if ▆▆▆ and the then-incumbent Mayor were the only candidates in the mayoral race.  The investigation has also found other correspondence reflecting that this result (*i.e.*, that ▆▆▆ electoral performance against the incumbent would improve if other candidates dropped out) was expected by members of the ▆▆▆ Campaign.

**Paragraph (h): Evidence related to payments, employment, or other benefits provided to, offered to, or promised to Mayoral candidate ▮▮▮▮▮▮ for political activity.**



27.    The investigation has found evidence that in August 2010, including in particular between August 16 and 26, 2010, that ▮▮▮ and others conspired to offer payments, employment, and/or other benefits to another Mayoral candidate, ▮▮▮▮▮▮▮▮▮▮, in exchange for ▮▮▮▮▮▮ dropping out of the primary race and endorsing ▮▮ for Mayor of the District of Columbia.    According to ▮▮▮▮ and Harris, Harris served as a point-of-contact and communicated with both ▮▮ and ▮▮▮ in discussing the offered payments, employment, and/or other benefits to ▮▮▮▮.

28.    Among other things, ▮▮▮▮ provided to investigators an August 27, 2010 email he sent to ▮▮ (at ▮▮▮▮▮▮▮▮▮▮ recounting the history of discussions between ▮▮▮▮ and Harris, including a meeting between ▮▮ and ▮▮▮ on August 16, 2010. As set forth therein:

> After meeting you in Mitchellville[, Maryland] on Monday the 16th, of August, I too thought we had a preliminary deal. You said that you needed 24hrs to solidify the terms of our deal, but your offer was to recommend to the Democratic State Committee that I be placed in the interim seat after K. Brown wins.[5] I mentioned a Deputy Mayor position, but you said that you had only thought about having two deputy mayors, one for Economic Dev and Education. We mutually agreed on the interim council seat and we shook hands.
>
> Then you called me on Fri., the 20th to say that Ms. Harris would be contacting me to make it happen on your behalf. That evening I met with Ms. Harris and she said that the terms you and I agreed on were unacceptable, but offered instead the position of deputy mayor. This was new to me because deputy mayor was off the table on Monday. I left her condo that evening and there was no agreement.

---

[5] In August 2010, at the time of the email, Kwame Brown held an At-Large Council Member seat on the D.C. Council and was running for D.C. Council chair in a race he was widely expected to win. Kwame Brown's victory would result in a vacant At-Large seat.

Tues the 24th, I called Ms. Harris back and said that I was still interested in making the deal happen, but it needed to be before COB the following day so that I could get a refund on upcoming commercial time. The next day, we had a verbal agreement on terms to include a deputy mayor position. Thurs the 26th, Ms. Harris said that she needed something from me in writing to confirm that I had accepted the deal. I agreed and wrote her a two sentence statement accepting the offer pending a conversation with you to clarify your vision for me in the deputy mayor post. It was after receiving this correspondence that Ms. Harris stated that the deputy mayor post was for the Office of Cable TV. This was the first time this was ever stated to me. Given that my platform is to address the root causes of generational poverty, I have absolutely no interest in the Office of Cable TV. This post would do nothing to assist people most in need and politically it does nothing to build my resume. After hearing that from Ms. Harris, the deal was off.

As I told ████████ yesterday, I'm still interested in supporting your candidacy and in turn receiving your support for the interim seat on the council that you mentioned at our initial meeting plus the terms you and I initially agreed and shook on. I sincerely look forward to hearing from you today.

Together we'll Beat Fenty!



29.  ████████ was interviewed by investigators and also described the course of communications with ████ and Harris, including offers of the positions mentioned in the email and offers to give ████ money to provide for debt relief for his campaign, ████ stated.

30.  ████████████████ wanted ████ paid to drop out of the mayoral race. ████ told Harris that ████ wanted $50,000 to drop out of the race because he had expenses and staff to pay. ████ told Harris the ████ Campaign only had $20,000 and could pay an additional $10,000 if there was money left over. ████ wanted to pay ████ through Harris because the ████ Campaign did not want publicity from their campaign report. ████ told Harris to invoice the ████ Campaign. ████████ that she submitted an August 26, 2010 invoice for "professional services" to the Committee to Elect ████ but that the funds were intended to

11

pay ██████ $20,000 to drop out of the race. After the ██ Campaign issued a check to Harris's company, Details, for $20,000, dated August 26, 2010, Harris then met with ██████ to discuss paying him to drop out. Harris relayed ████ offer. ██████ told Harris he did not want the money being offered and that he would talk to ████ However, ██████ was furious because ████ said he would give him $50,000 and a cabinet position. When ██████ left, Harris called ██ and told ██ what happened. Harris also told ██ that this was a waste and ████ response was "I just want him out." Harris subsequently sent the $20,000 check back to the ██ Campaign.

31.     Investigators identified copies in the ██ Campaign records of the invoice from Details and a check from the ██ Campaign to Details in the amount of $20,000.

32.     Mark Long ("Long"), who worked from time to time for Details (owned by Harris) and for D.C. Chartered Health Plan Inc., a company owned and/or controlled by Thompson, served as Director of Advance Operations for the ██ Campaign, including serving as the official campaign driver for ██ On or about September 5, 2014, Long entered a cooperation plea agreement and pleaded guilty to one count of conspiracy under D.C. Code 22-1805a. As part of his statement of offense and in other statements, Long described the following. Long discussed with Harris a request by ██ to arrange a secret meeting with ██████ the purpose of which (as directed by ██ would be to attempt to arrange an agreement whereby ██████ would drop out of the race and endorse ██ in exchange for a thing of value. As requested by Harris, Long arranged a residence in Maryland for the meeting. Long drove ██ to the meeting with ██████ After the meeting, while Long drove ██ back to the District of Columbia, ██ said that ██████ wanted a specific position in ██ administration, that is, the head of the District's motion picture and television agency.

33.    The OCF was an agency and department of the District of Columbia with jurisdiction to enforce the limits and prohibitions of the District of Columbia Campaign Finance Reform and Conflict of Interest Act of 1974, as amended (then codified at D.C. Code §§ 1-1101.01 through 1-1151.06) (the "D.C. Campaign Act"). OCF was a division of the District of Columbia Board of Elections and Ethics.

34.    There is evidence that, on or about September 7, 2010, the ▮ Campaign filed a false and misleading OCF Form 16 report and statement with OCF, that it stated that the purpose of the $20,000 payment to Details was for a "Consultant" when the payment, in fact, was intended to be used by Harris to pay ▮ in exchange for dropping out of the election for Mayor of the District of Columbia and endorsing ▮.

35.    Ultimately, ▮ remained in the election for Mayor of the District of Columbia. ▮ did not endorse ▮. ▮ was unsuccessful in the election. ▮ did not receive employment with the District of Columbia or a financial benefit from ▮ following ▮ ▮

36.    On or about October 12, 2010, the ▮ Campaign filed an OCF Form 16 with the OCF stating that, on September 13, 2010, Details had returned the $20,000 payment to ▮ principal campaign committee as a "refund."

**Paragraph (i): Evidence of payments, employment, or other benefits provided to, offered to, or promised to Mayoral candidate ▮ for political activity.**

37.    ▮ was an announced Mayoral candidate in the 2010 election.

38.    In May 2012, Howard Brooks ("Brooks") and Thomas Gore ("Gore") each pled guilty to charges in a continuing investigation of campaign activities during the 2010 mayoral election in



Washington, D.C. Gore was the assistant treasurer for the ▮▮ Campaign. Brooks served on the treasury and finance committees for the ▮▮ Campaign. Brooks and Gore helped carry out a plan to divert funds from the ▮▮ Campaign to ▮▮ principal campaign committee. The purpose of the payments was to keep ▮▮ in the mayoral race. ▮▮ was known for verbally attacking Adrian Fenty, who was then Mayor of the District of Columbia and was running for reelection, during candidate debates and other forums in 2010. According to the statement of offense, signed by Brooks, beginning in or around June of 2010, Brooks was instructed to make payments to ▮▮ Gore provided money orders to Brooks who gave them to ▮▮ The statement of offense provides details about ten money orders, signed and blank, that Brooks delivered to ▮▮ between June 15, 2010, and August 6, 2010. The money orders had a total value of $2,810. Prior to their guilty pleas, both Brooks and Gore denied providing payments to ▮▮

39.    Gore has admitted that he discussed supporting ▮▮ to keep ▮▮ in the race with ▮▮ Brooks, and ▮▮ who was ▮▮ principal campaign committee. As a result of those discussions, according to Gore, he provided money orders intended for the ▮▮ Campaign to Brooks to give to ▮▮ to support ▮▮ principal campaign committee.

40.    ▮▮ remained in the election for Mayor of the District of Columbia. ▮▮ ▮▮ in the election. In or about January 2011, ▮▮ received a paid position as an employee of the District of Columbia government.

**Paragraph (g): Evidence of specified persons and their activities, whether official or unofficial, related to the ▮▮ campaign**

41.    The investigation has also revealed that various individuals and their activities, whether official or unofficial, related to the ▮▮ campaign and the Thompson-funded GOTV

activities, are relevant to both establishing the scope and nature of the offenses under investigation and the knowledge of those offenses. Those individuals include the following:



Howard Brooks;

Thomas Gore;

Eugenia C. Harris;
Vernon Hawkins;

Jeffrey E. Thompson; and

42.     The roles of ▮▮ Hawkins, Thompson, and Harris were all described above. In addition to his activities as described above, Gore had knowledge of the field operations budget for the ▮▮ Campaign, as Gore worked with others to put together a GOTV budget.

43.      was the ▮▮ for the ▮▮ campaign. ▮▮ and ▮▮ were the two signatories on the campaign's bank account. Among other things, ▮▮ along with Gore reviewed and paid invoices for the campaign.

44.     As of July 2010,  was the ▮▮ for the ▮▮ Campaign and had responsibility for supervising field operations, including the principal campaign committee's GOTV activities.



45.     In August 2010, the ▮▮▮ Campaign hired ▮▮▮▮▮▮▮▮▮▮▮▮▮ to manage GOTV operations.  Among other things, as part of the GOTV operations, ▮▮▮ hired and supervised canvassers who conducted the GOTV activities. ▮▮▮ had a contract with and was paid by the ▮▮▮ Campaign.

46.     On August 30, 2010, according to multiple witness statements and documents, ▮▮▮▮ ▮▮▮▮▮▮▮ met with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ ▮▮▮▮▮▮. ▮▮▮ and ▮▮▮ were not hired, however, by the ▮▮▮ Campaign committee; rather, ▮▮▮ and ▮▮▮ were paid by Harris as part of the Thompson-funded GOTV activities.  On or about the week of August 30, 2010, ▮▮▮ and ▮▮▮ began conducting those activities in support of and in coordination with the ▮▮▮ Campaign.

47.     As part of her GOTV operations on behalf of ▮▮▮ principal campaign committee, ▮▮▮▮ actively coordinated with ▮▮▮ and a team of canvassers who ultimately reported to him. ▮▮▮▮ team was called the "Purple Team," and ▮▮▮ team was called the "Gold Team."  As ▮▮▮▮ has described to investigators, ▮▮▮ canvassers (the Gold Team) had primary responsibility for certain wards and areas of the District, while ▮▮▮ canvassers (the Purple Team) had primary responsibilities for other wards and areas.  Among other things, ▮▮▮ trained both sets of canvassers and both sets of canvassers used the same materials.  However, ▮▮▮ and his canvassers were not paid by ▮▮▮ principal campaign committee.

48.     ▮▮▮▮▮▮▮▮▮▮▮▮▮ had responsibility for field operations for ▮▮▮ principal campaign committee until he was replaced by ▮▮▮▮▮ in or around July 2010. Thereafter, ▮▮▮▮ nonetheless remained involved in field operations, working on GOTV activities and interacting with both ▮▮▮ and ▮▮▮

49.  ▮▮▮▮▮▮ was the ▮▮▮▮▮▮ for the ▮ Campaign.  Among other things, as discussed above, Brooks and Gore have described ▮▮▮▮▮▮ involvement in discussions about making payments to ▮▮▮▮▮▮ in or about June 2010.  The investigation has also identified certain evidence showing ▮▮▮▮▮▮ knowledge of the Thompson-funded GOTV activities.  For example, ▮▮▮▮▮▮ described a meeting with ▮▮▮▮▮▮ among others, discussing a problem with the canvassers who were part of the Thompson-funded GOTV activities.

50.  ▮▮▮▮▮▮ was a District of Columbia political consultant, a former campaign worker and ▮▮▮▮▮▮ girlfriend (including during the period of the 2010 campaign), and a friend of ▮▮▮▮▮▮ among others.  ▮▮▮▮▮▮ stated that she did some informal work for the ▮ Campaign.

51.  In a September 6, 2010 email, a copy of which has been obtained by law enforcement, ▮▮▮▮▮▮ told ▮▮▮▮▮▮ that "Vernon is doing something off the books" and "maybe he is doing his own GOTV."  Vernon refers to Vernon Hawkins, who at the time of the email was managing the Thompson-funded GOTV efforts in support of and in coordination with the ▮▮▮▮▮▮ Campaign.  After initially asking ▮▮▮▮▮▮ to "find out what that is," ▮▮▮▮▮▮ then stated, "I'm not in the loop (and don't want to be)!"  In addition, ▮▮▮▮▮▮ described two conversations with ▮▮▮▮▮▮ in which ▮▮▮▮▮▮ asked ▮▮▮▮▮▮ to have ▮▮▮▮▮▮ contact her about "the other campaign," which ▮▮▮▮▮▮ described as something that Hawkins and Harris were doing and which was driving ▮▮▮▮▮▮ crazy.  ▮▮▮▮▮▮ described passing the messages along to ▮▮▮▮▮▮.

52.  ▮▮▮▮▮▮ has also told law enforcement agents that, after ▮▮▮▮▮▮ she asked ▮▮▮ to see if Thompson could assist her in finding a job.  According to ▮▮▮▮▮▮

17

███ agreed to ask Thompson to assist her with finding a job. ███████████

███████████ that they arranged for employment for ███ with money from

Thompson through an intermediary. Specifically, ███ has stated and produced records

corroborating that she arranged to pay $47,000 to ████████████ a company

controlled by ███████ so that ██ would pay █████████ a salary of $45,000 over a six

month period for services provided by ██████████ to ██████████ which was

another company controlled by ████████ Harris paid a portion of the money to ███████

█████████ and a separate portion of the money to █████████

    53.   ████████████████████████ is the █████████

████████ was a campaign volunteer for the ███ Campaign. Phone records show that shortly after

the primary election on September 14, 2010, Thompson was in telephone contact with telephone

numbers associated with, among others, Vernon Hawkins, █████████ and █████████

█████████ Hawkins informed Thompson that the ███ Campaign did not have money

to pay students at Howard University for campaign-related work in support of the ███ Campaign

and that the money was intended to be given to █████████ to pay to the campaign workers.[6]

Thompson stated that he agreed to provide funding of $10,000 to █████████ to cover campaign

expenses incurred by ████████ in support of and in coordination with the ███ Campaign.

Thompson stated that he paid the $10,000 through an intermediary, █████████ █████████

█████████████ corroborated Thompson's statements that ███ received money

from Thompson to pay to █████████ for campaign-related expenses. Bank records evidence the

---

    [6] █████████████████████ Hawkins did not recall such an event related to █████████

███

18

following transactions on September 17, 2010:   (a) a wire transfer of $15,200 from one of

Thompson's companies to ▆▆▆ and (b) cash withdrawals from ▆▆▆ account in the amounts of

$9500 and $1000 in Washington, D.C. and Maryland. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆ he used the money that he received from Thompson's company to personally pay $10,000 in

cash to ▆▆▆▆ on September 17, 2010, as requested by Thompson and Hawkins to pay for

campaign-related expenses.[7]

54.   ▆▆▆▆▆▆▆▆▆▆ he was responsible for fundraising for the ▆▆▆

campaign. ▆▆▆▆▆▆▆, Thompson and Harris had a conversation with ▆▆▆ (after

▆▆▆▆▆▆▆▆ in which Harris told ▆▆▆ that Thompson had funded and Thompson and

Harris had orchestrated the Thompson-funded GOTV activities.

**Paragraph (j): Evidence related to the ▆▆▆▆▆▆▆ or ▆▆▆▆▆**

55.   ▆▆▆▆▆▆ was the ▆▆▆ of the ▆▆▆▆▆▆

▆▆▆ at the time of the primary and general elections in 2010. The ▆▆ endorsed ▆▆▆▆

for Mayor of the District of Columbia during the 2010 election.   Following the general election in

November 2010, ▆▆▆ was in a run-off election for ▆▆▆ of the ▆▆▆▆▆▆

▆▆▆ that ▆▆▆ asked Harris to ask Thompson to give $10,000 to ▆▆▆.[8] ▆▆▆

▆▆▆ Thompson agreed to pay $10,000 to ▆▆▆ and Harris subsequently gave $10,000 in cash

to ▆▆▆▆▆▆▆▆ Harris, on ▆▆▆ behalf, asked Thompson to pay

---

[7] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆ has known Thompson and Hawkins for several

years before these events in 2010.  Thompson has made payments to ▆▆▆ prior to and after 2010

in exchange for services provided by ▆▆▆ for Thompson's benefit.

$10,000 for the benefit of ▮▮▮ and Thompson authorized the payment. Mark Long, who was working for Harris at the time of the payment to ▮▮▮▮▮▮▮▮▮ that Harris gave Long a package and directed Long to hand the package to a man he subsequently learned was ▮▮▮ ▮▮▮ has told law enforcement that he asked ▮▮▮ for $10,000 to support ▮▮▮ run-off election and told ▮▮ that ▮▮ could legally provide the funding, which ▮▮▮ subsequently received in cash from a man unknown to ▮▮ but who was in the company of a woman he thought was Harris at the time of the payment.

### The Subject Domain

#### Use of the Subject Domain During the 2010 ▮▮ Campaign

56.     During the primary campaign, the ▮▮ Campaign established the following domain through Google, Inc.: ▮▮▮▮▮▮▮, also referred to as www.google.com/a/▮▮▮▮▮▮ (hereinafter, the "**Domain**"). Once the **Domain** was established, the ▮▮ Campaign established individual email accounts for ▮▮ and various campaign workers on the **Domain**.

57.     Through its investigation, the government has obtained various email correspondence with the domain name ▮▮▮▮▮com. ▮▮▮▮, for example, recently produced emails and email chats from the **Domain** associated with her individual email account on the **Domain** (▮▮▮▮▮▮com). ▮▮ emails and email chats, as well as documents produced by individuals and entities associated with the ▮▮ Campaign, reflect communications with the following ▮▮ Campaign staffers that maintained individual email accounts on the **Domain**: ▮▮▮▮▮▮▮com); ▮▮▮▮▮▮▮▮▮

---

[8] Harris initially told law enforcement that ▮▮ had asked Thompson to give $10,000 to

██████████████████████████; Vernon Hawkins, a Special Advisor to the ████

Campaign ████████████████████████████████████████████████████████



██████████████████████████ Mark Long, Director of Advance Operations for the

████ Campaign ███████████████; ███████████ executive assistant to ████

██████ on the ████ Campaign ████████████████; █████████████ a

campaign volunteer for the ████ Campaign ██████████████ and others. These

documents evidence that these individuals and others on the ████ Campaign used the email accounts

maintained on the **Domain** to communicate about various matters related to the ████ Campaign.

58.    For example, on May 13, 2010, ████ (using ████████████████com)

corresponded with ████████ (at ██████████com) through an email chat to discuss the ████

Campaign's hiring of a new field director. The email chat referenced, among other things, the

internal organization of the ████ Campaign and described ████████ as "the most detail oriented

guy." In the email chat, ████ reported to ████ that ████████████████ for the

████ Campaign, "finally just realized he needs to check his ████████████account." ████

responded to ████ in part, by stating the following: "good god man check your goddamn email.

The address everyone fucking has and has been fucking emailing for a fucking month." ████

reply suggests that the individual email accounts maintained on the **Domain** were regularly used by

members of the ████ Campaign to communicate with each other about the Campaign.

---

████ but later stated that ████ had asked Harris to ask Thompson to give $10,000 to ████

59.    Other emails reflect communications about campaign finances and campaign operations related to the ▮▮▮ Campaign, and thus reflect on the knowledge of ▮▮▮ and others concerning the ▮▮▮ Campaign's finances and operations.  For example, ▮▮▮▮▮▮ which was the day after the ▮▮▮ Campaign publicly filed a disclosure report with the OCF announcing that the ▮▮▮ Campaign had raised over $530,000 in contributions for the reporting period, ▮▮▮ (at ▮▮▮▮▮om)  emailed ▮▮▮▮ (at ▮▮▮▮▮▮ and ▮▮▮ (using ▮▮▮▮▮▮▮▮) stating the following:  "So, I'm as over the moon as anyone about the fundraising number, but I feel compelled to ask... As late as on yesterday's comms call, ▮▮▮▮▮ was warning us to expect a number in the low $300,000s.  The cash on hand obviously seemed to support that projection.  I'll ask this on the call today, but where did this extra $200,000+ come from?  And how's it possible that the projection was so unbelievably ridiculously far off?"  ▮▮▮ (using ▮▮▮▮▮▮▮▮) replied to ▮▮▮ as follows:  "Lots of last minute checks and ▮▮▮▮▮ had 100k in his pocket.  Lots of checks from out of state---so people were washing money."

60.    Additional emails reflect communications about campaign finances and campaign operations related to the ▮▮▮ Campaign, and thus reflect on the knowledge of ▮▮▮ and others concerning the ▮▮▮ Campaign's finances and operations.  For example, on June 29, 2010, ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ sent an email (using ▮▮▮▮▮▮▮▮▮ to a vendor for the ▮▮▮ Campaign and approved an invoice, which was attached to her email, for a banner and installation of the banner at ▮▮▮▮▮ Washington, D.C.  In her email, ▮▮▮▮ copied the following individuals on the ▮▮ Campaign:  ▮▮▮▮ (at ▮▮▮▮▮▮▮ ▮▮▮▮ (at

22



; (at , and (at . Based on records produced by OCF, it appears that the invoice referenced in and attached to email was "SOLD TO" the Campaign, "ATTN: Jeanne Harris."

61.     Emails on the **Domain** include discussion related to problems with the official Campaign's GOTV activities that led to the implementation of the Thompson-funded GOTV activities and thus contain relevant evidence of the scope of the knowledge of that effort by and others. For example, on July 24, 2010, a for the Campaign, sent an email (using to (at , with the subject line "this is what I sent to late last night," which stated, among other things, the following: " I spent the entire morning at the field office. Although I shared my concerns with and via email, I feel it's important that I share them directly with you as well. In short, it's worse than I thought. Just one example – the infrastructure for the office (i.e., computers and phones) has yet to be setup. I know there is a lot happening and you are being pulled in many different directions, but it is hard to imagine after seeing the field operation 'in action' that this is not the number one priority." These same problems reported to by among others, contributed to the implementation of the Thompson-funded GOTV activities.

62.     Another example of an email reflecting communications about campaign finances and campaign operations, and thus reflecting on the knowledge of and others concerning the Campaign's finances and activities, was an email chat between (at

23

███████████████████████ and ████ (at █████████████████, from 11:23 p.m. on

August 10, 2010, through 12:00 a.m. on August 11, 2010. August 10, 2010 was the day the████

Campaign was required to publicly file a disclosure report with the OCF announcing the amount the

████Campaign had raised in contributions for the reporting period. In her email chat, ████ stated,

among other things, the following: ████ just walked in with 90k in his pocket."

    63.    The emails also reference coordination between personnel responsible for the official

████ Campaign's GOTV efforts, such as ██████████ and personnel responsible for the

Thompson-funded GOTV activities, such as Vernon Hawkins, ██████ and ████████. For

example, on August 31, 2010, ████ (using ████████████████ and ████ (at

██████████████ engaged in the following email chat:

> ████ so now they want . . . badges[.] do you have time or should i find someone
> else[?]

> ████ : i'm sorry, who are you talking about and for what[?]

> ████ they want staff badges that are non[] duplcatable [sic] and say primary[.] our
> crackpot gotv . . . team

> ████ i'm totally open to it and we'll need for election day real staff and wannabe
> staff[,] but can we discuss this afternoon?

> ████ yes all these new people

> ████ ████████ yeah

> ████ nope vernon [Hawkins]'s[.] long story

> ████ oh fuck me[.] ok

> ████ : told to work with ████ .] vernon was going to pay them[.] ████████
> ████ said no[.]

64.    Another example of the coordination between personnel responsible for the ███

Campaign and personnel responsible for the Thompson-funded GOTV effort was an email from

████████ (at ████████ com) to ███ (at ██████████ com), dated

August 31, 2010. The investigation has shown that ███ was paid by Thompson, through Harris, to

manage the Thompson-funded GOTV effort. In his email, ███ identified for ███ "everyone that

is working on GOTV that needs access to the office." The "office" referred to the physical space that

housed both personnel responsible for the ███ Campaign and personnel responsible for the

Thompson-funded GOTV effort. The list of individuals provided by ███ to ███ included

individuals responsible for the ███ Campaign and individuals responsible for the Thompson-funded

GOTV effort. ███ emailed (using ██████████ com) ███ on September 2,

2010, and attached "ALL ACCESS" badges for the ███ Campaign's field office in the names of

individuals responsible for the Thompson-funded GOTV effort, such as ████████ and

████████

65.    Another example of the coordination between personnel responsible for the ███

Campaign and personnel responsible for the Thompson-funded GOTV effort was an email dated

September 11, 2010, from ███ (at ██████████ com) to a vendor for a

Predictive Dialer, which the ███ Campaign intended to use in the final days of the primary election.

███ copied on his email Hawkins (at ██████████ com) and ███ (at

██████████ com). Ultimately, ███ requested and approved a ███ Campaign

requisition for $1860 for the Predictive Dialer for a company controlled by ███ an individual

responsible for the Thompson-funded GOTV effort. Additionally, the ███ Campaign reported to

OCF that it paid $1860 to ███ company. However, investigators have not been able to locate the

25

purported payment of $1860 from the ▇ Campaign to ▇ company.  Instead, there is evidence that Harris paid ▇ company $1540 for the Predictive Dialer.  This series of events shows coordination between personnel responsible for the ▇ Campaign and personnel responsible for the Thompson-funded GOTV effort.

66.     Another example of the coordination that existed between personnel responsible for the ▇ Campaign and personnel responsible for the Thompson-funded GOTV effort was an email from ▇ (at ▇ com), dated September 15, 2010, to numerous individuals, thanking them for their dedication, patience and hard work during the primary, which had concluded on September 14, 2010 with ▇ victory in the primary election.  The email noted that the recipients "did whatever was necessary to assure that ▇ was elected mayor." The email was addressed to, among others, the following individuals: ▇ (at ▇ om); ▇ (at ▇ com); ▇ (at ▇ com); ▇ (at ▇ com); ▇ (at ▇ om);  and  Mark  Long  (at ▇ com).

67.     Emails that were on the **Domain** also evidence ▇ work on behalf of the ▇ Campaign, including his work with students at Howard University.  For example, on August 16, 2010, an individual emailed ▇ (at ▇ com) and ▇ (at ▇ om) complaining that "[t]here are Fenty people along HU [Howard University] registering students to vote in Sept."  ▇ forwarded the email to ▇ (at ▇ com and ▇ com) and asked if "we have the young lady who volunteered early on at HU?"  ▇ responded (using ▇ com)

26

back to ▮▮▮ stating the following: "I have the biggest party promoter at HU working with us. He *did the* event at Ibiza for HU students on Monday. We are putting a team together at HU now. I need T-Shirts for the HU Team. Can you help?"

68.     Documents produced by ▮▮▮▮ and others evidence that the **Domain** was used through the primary and general elections in September and November 2010. In addition, documents recently produced by ▮▮▮▮ demonstrate that the **Domain** was available for use after the general election in November 2010 and appears to be currently accessible.

69.     Based on the foregoing information revealing that the **Domain** was used throughout the 2010 mayoral campaign in various ways related to the ▮▮ Campaign, the records maintained in and related to the **Domain** are likely to contain evidence of violations of 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 600 (promise of employment or other benefit for political activity); D.C. Code § 1-1107.01(b), amended and recodified in D.C. Code § 1-1163.35(c) (making a false statement or report); and D.C. Code § 22-1805a (conspiracy to commit crime or defraud the District of Columbia of lawful government functions).

## CONCLUSION

70.     Based upon the foregoing information and the affiant's experience, there is probable cause to believe that within the information described herein and in Attachment A, there exists evidence, fruits, and instrumentalities of criminal offenses as set forth above. Therefore, your affiant respectfully requests that a warrant be issued authorizing the search and seizure of those items set forth in Attachment B. Attachments A and B are incorporated by reference herein. Because the warrant involves records already in the possession of government agents, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

27

## REQUEST FOR SEALING

71.     I further request that the Court order that all papers in support of this application,

including the affidavit and search warrant, be sealed until further order of the Court.  These

documents discuss an ongoing criminal investigation, the details of which are not public.  Nor is all

the information obtained in the investigation known to all of the targets of the investigation.

Accordingly, there is good cause to seal these documents because their premature disclosure may

seriously jeopardize that investigation.



Special Agent
Federal Bureau of Investigation

Subscribed to and sworn to before me
on this __th day of January 2015.

_____
United States Magistrate Judge

DEBORAH A. ROBINSON
U.S. MAGISTRATE JUDGE

28